United States District Court
For the Eastern District of Louisiana

| | |
|---|---|
| IN RE: APPLE iPHONE 3G AND 3GS "MMS" MARKETING AND SALES PRACTICES LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>LARRY ISHMAEL, on behalf of himself and a Class of all individuals similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>APPLE, INC. and AT&T MOBILITY, LLC,<br><br>        Defendants.<br><br>(Washington State – New original filing to be filed directly into the MDL proceeding) | MDL NO. 2116<br><br>2:09-md-2116<br><br>SECTION: J<br><br>COMPLAINT AND JURY DEMAND<br><br>JUDGE BARBIER<br>MAG. JUDGE WILKINSON |

## COMPLAINT

Plaintiff, by and through his undersigned counsel, individually and on behalf of all others similarly situated, files this Class Action Complaint against Defendants Apple, Inc. (hereinafter "Apple") and AT&T Mobility, LLC (hereinafter "AT&T").

## NATURE OF CASE

1.    This is a class action from the unfair, deceptive, and fraudulent practices by Defendants Apple and AT&T, with respect to the marketing, advertising, and sale of the iPhone 3G and 3GS products (hereinafter "iPhone"), brought by Plaintiff on his own behalf and on behalf of a class of others similarly situated, those persons being all Washington State residents, who between July 2008 and when the MMS function became available on the iPhone have purchased an iPhone from Defendants.

1

2.      Since 2007, Apple and AT&T co-marketed the iPhone with AT&T's wireless network service.  As a result of Defendants' "exclusivity agreement" when purchasing an iPhone during the Class period, Defendants required all Class members to obtain wireless service, including messaging plans, for their iPhones exclusively from AT&T.

3.      On or around the time the Defendants began their launch of the new generation of the 3G phones, text messaging was a standard feature of mobile phones and extremely popular. This medium allowed consumers to send messages and photos to other phone users without having to be connected to an Internet service.  Texting is a faster, easier, and less expensive way to communicate between consumers than traditional email.   All other phones on AT&T's network that had cameras offered this popular feature of texting photos.

4.      Plaintiff is informed and believes that as the Defendants were about to launch the 3G phone, a grave complication developed.  Sending pictures by text took considerably more capacity than sending a written text message, and AT&T realized that its entire network would be overloaded if millions of new iPhone users began texting pictures on the 3G iPhone.

5.      AT&T needed to build up its network to support this new capacity, and that would take time.   Defendants knew that consumers would expect that the iPhone, a "revolutionary product" with a superior camera and picture quality, would be able to text pictures.  Defendants did not want to lose market share by announcing this feature would not be available and did not want to delay the lucrative launch of the new generation of 3G iPhones, thus, losing out on the extra revenue from millions of additional customers who had to lock into AT&T's exclusive contract for service.

6.      AT&T's network was unable to provide the service of texting pictures until it upgraded its network.  Therefore, the Apple iPhone 3G and 3GS phones could not, in sharp contrast to almost all other phones on the market, text or receive pictures from other phones.

7.      AT&T made a decision to let all of its customers, except iPhone customers, have access to its network to text pictures.  AT&T promoted and sold unlimited texting plans to all its customers, called "Messaging Unlimited," which gave its customers the ability to send unlimited messages to any wireless phone in the United States for $19.99 per month.   Promoting its Message Unlimited capabilities, AT&T advertised and represented to consumers, including Plaintiff, that its Messaging Unlimited plan **"included text, picture, video and IM."**  AT&T also offered unlimited "Family Plans" for $30.00 per month, while at the same time AT&T was intentionally barring iPhone users from having the same ability givens its network limitations.  However, AT&T continued to charge the consumers for that service and represented to iPhone users that the service included pictures.

8.      Meanwhile, Apple covered up the "problem" with an intentionally misleading advertising campaign.  Specifically, Apple never disclosed to consumers that they had to pay for the picture messaging under the unlimited plans from their exclusive provider, AT&T, even though they would not have that service.  Moreover, Apple made affirmative representations that such a service was available on the iPhone, including large in-store videos showing people texting pictures with small, fine print disclosures about when the service was available, intentionally designed so that consumers would not see or understand them.

9.      MMS was and is commonly available on many phones and mobile networks, including AT&T's.  Even though the function was disabled, AT&T charged Plaintiff and Class members the same price as customers with different phones that supported MMS service.  That

3

is, despite advertisements to the contrary, Plaintiff and Class members paid for something they did not receive.

10.     AT&T breached its contracts with Plaintiff, the Class, and the Sub-Class by charging for and receiving payment for the MMS feature and service that it did not provide, and it has otherwise been unjustly enriched at Plaintiff's and the Class members' expense.

11.     Defendants each engaged in conduct that is likely to deceive and has deceived the public through (1) omission, suppression, and concealment from the public of material facts related to the iPhone 3G and 3GS mobile phones' MMS features and the AT&T messaging plans and (2) making and disseminating or causing to be made or disseminated untrue and/or misleading statements that were known, or by the exercise of reasonable care should have been known, to be untrue and misleading.

## THE PARTIES

12.     Plaintiff, LARRY ISHMAEL, is an individual residing in Redmond, King County, Washington who purchased a model of the iPhone 3G and the accompanying AT&T voice and data service plan for the iPhones in Washington State.

13.     Apple is a corporation organized and existing under the laws of the State of California; maintains its principle place of business in Cupertino, California; and conducts and transacts business within this Judicial District.

14.     Apple manufacturers, markets, and sells the iPhone, among other consumer electronic devices.

15.     AT&T is a limited liability company organized and existing under the laws of the State of Delaware; maintains its principal place of business in Atlanta, Georgia; and conducts and transacts business within this Judicial District.

4

16.     AT&T markets and sells the iPhone, and, upon information and belief, pursuant to a written agreement with Apple, was at all relevant times the exclusive provider of wire and data service to iPhone customers.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), in that: (1) there is complete diversity; (2) the amount in controversy exceeds $5,000,000.00 exclusive of interests and costs; and (3) there are 100 or more members of the proposed Plaintiff class.

18.     Venue lies in this District because of the Multi-District Litigation proceeding pursuant to 28 U.S.C. § 1407 and Pre-Trial Order No. 5 grants direct filing into this Court.

19.     Venue on remand is proper in the United Stated District Court, Western District of Washington pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in the district.

## COMMON FACTS

20.     In January 2007, iPhone sales commenced.

21.     Defendants Apple and AT&T each promoted and advertised the iPhone's and AT&T's messaging plans.  To maximize profits, Apple would manufacture the iPhones and AT&T would be the exclusive network upon which the iPhone would operate, including being the exclusive provider of messaging service plans for the iPhone, for which AT&T charged its customers more money than a basic phone service or phone and data service plan.

22.     The iPhone is a combination of an iPod (an electronic device that stores thousands of music files and plays them back for the listener) and a cellular mobile telephone (which allows

users to engage in wireless communication while mobile) with an incredible amount of creative functionality.

23.     Apple is a personal computing and digital media distribution company. Its products include Mac computers, iPod digital music players, iTunes online music store, and iPhone mobile devices. Apple generated $32 billion in revenue in the fiscal year of 2008.

24.     At all relevant times, the cell phone portion of the iPhone worked exclusively with AT&T's cellular phone network. Defendants Apple and AT&T commenced the iPhone as a joint venture. Both AT&T and Apple sold, and continue to sell, the iPhone in their respective stores.

25.     In January 2007, Apple announced the creation of a new mobile phone, claiming that it "reinvented the phone" and offered "revolutionary" features. The new phone was called the iPhone. Defendants have sold the iPhone from their stores and websites since its launch in 2007.

26.     The iPhone is a high-end mobile device, capable of making telephone calls; accessing the Internet; taking photographs; operating as a digital music player; and sending and receiving other popular messaging formats, such as MMS.

27.     MMS provides added benefits to the consumer. The MMS benefits include the following advantages over email: No separate charge for a data plan for e-mail service is required; MMS allows consumers to make full use of the cell phone's camera and video functions and then send the pictures or video utilizing the mobile phone number. Sending text, pictures and videos via a mobile phone's messaging function is faster and simpler; and MMS's can be sent to and from most mobile phones, even those that do not have email functionality.

28.     In an effort to continue building demand for the popular iPhone, following the launch of the iPhone 2G on June 29, 2007, in October of 2007, AT&T continued marketing its Message Unlimited plan by airing television commercials that advertised its messaging plans allowed customers to send text, pictures, and videos over iPhones.  One of the commercials featured a mother scolding her children and their grandmother for sending thousands of text messages in a month.  The announcer then cuts in stating, "Now get a texting plan the whole family can N-J-O-Y.  AT&T brings your family unlimited messaging to anyone on any network."  An orange screen then appeared, showing in large bold print, "UNLIMITED MESSAGING" with words, "Text, Picture, Video, IM" below.

29.     This well orchestrated and omnipresent marketing plan led to significant demand for the iPhone and messaging plans.  In July 2008, Defendants started selling the next generation iPhone: the iPhone 3G.

30.     The 3G network offered significant advantages over the 2G network.  3G or 3rd generation is a family of standards for mobile telecommunications defined by the International Telecommunication Union, including GSM EDGE, UMTS, and CDMA2000 as well as DECT and WiMAX.  Services include wide-area wireless voice telephone, video calls, and wireless data, all in a mobile environment.  Compared to 2G and 2.5G services, 3G allows simultaneous use of speech and data services and higher data rates (up to 14.0 Mbit/s on the downlink and 5.8 Mbit/s uplink).  Thus, 3G networks enable network operators to offer users a wider range of more advanced services while achieving greater network capacity through improved spectral efficiency.

31.     In anticipation of the iPhone 3G's launch, in June 2008, AT&T announced its "iPhone 3G pricing plans," which were the same plans offered to all of its customers, including

7

those without the iPhone.  All of AT&T's plans that are relevant here required customers to enroll with AT&T for a period of years or face steep "early termination fees."  These plans expressly included "texting plans."  AT&T offered all of its customers a choice of $20 per month "unlimited" individual plan or a $30 per month "unlimited" family plan.  All AT&T customers who purchased one of these texting plans paid for and received MMS, except iPhone 3G customers, who paid for but did not receive MMS.  In other words, just like all other wireless service providers, AT&T sold the MMS service in a "bundle" with text messaging, where both messaging formats are included for a fixed price each month.

32.     From the time the iPhone was announced in July of 2008 through June 27, 2009, Apple sold over 20 million iPhones, with AT&T being the exclusive provider of the mobile network and messaging plans.

33.     The iPhone 3G was a financial bonanza for Apple and AT&T.  In October 2008, Apple CEO Steve Jobs announced that based on revenue, Apple had become the third-largest mobile phone supplier in the world.

34.     Only after the iPhone 3G's launch in July 2008, did AT&T publish a statement in the AT&T Answer Center page of its website acknowledging problems related to MMS:

> Customers who sent a MMS message and own a non-MMS capable device will receive a text message instead of an actual MMS message.  The message will contain the website address of www.viewmymessage.com/1  or  www.viewmymessage.com/2  as well as a user name and password.  To view the MMS message, please access the website from a computer and enter the user name and password provided in the text message.

35.     AT&T was instructing customers interested in MMS to access a website from a computer to view a message sent from one mobile phone to another mobile phone, which

8

negated the whole purpose of purchasing a phone and message plan that supposedly included MMS capabilities.

## 3GS

36.    The version of the iPhone launched in June 2009 is called the "3GS."  The iPhone 3GS sold over one million units in its first three days on the market, which included the best sales day in Apple history.

37.    In the spring of 2009, Apple and AT&T each initiated an advertising campaign to sell its older 3G models in preparation of the launch of 3GS.  Following the previous formula of falsely advertising MMS capabilities and messaging plans that included MMS, in March 2009 Defendants began promoting the iPhone 3GS claiming it had a MMS feature.  On March 17, 2009, Apple issued a press release relating to the iPhone 3GS, which stated in part, "The new iPhone OS 3.0 software will be available to iPhone … users this summer with over 100 new features including … MMS to send and receive photos …."  That same press release states that "MMS availability features including … MMS to send and receive photos."  The same press release states "MMS available only on the iPhone 3G …," which was false and misleading.

38.    On March 17, 2009, Apple gave a presentation to the media about the upcoming release of the new 3GS, including a video presentation by Scott Forstall, Apple's Senior VP for iPhone software, where he stated, "But the big news for the messages application is we're adding support for MMS.  So this, this is support for multimedia, you can now send and receive photos … so now you have one app to send and receive text, photos …. That is what we're doing with messages …."  Several minutes later, Mr. Forstall says, "messages now support for MMS."  This too was false and misleading.

9

39.   While Apple was promoting the 3GS's MMS feature, AT&T continued marketing its messaging plans, claiming the plans included MMS capability, when, in fact, that was not the case for its current 3G users and was not going to be the case for the new 3GS purchasers.

40.   On June 8, 2009, a new customer of AT&T and Apple was able to purchase the iPhone 3G at a greatly reduced price.  As part of the false advertising campaign, the Apple packaging that came with the iPhone 3G claimed the availability of MMS, with no reference to the service not being available until late summer.  This packaging insert was also false and misleading.

41.   On June 10, 2009, AT&T continued to falsely promote the iPhone and its messaging service by advertising on its website, without any late summer disclaimer, that the iPhone 3GS had MMS functionality.

42.   Likewise, furthering this false advertising campaign to promote the iPhone and messaging plan, Apple posted on its website, on the "iPhone OS 3.0 Software Update" Page, that MMS would be available, so that customers could "send MMS messages and include photos, audio, and contact info.  Even tap to snap a picture right inside Messages."  A graphic showed the iPhone text message bubbles with a picture inserted.

43.   At certain times during the class period, a similar graphic appeared on Apple's website promoting the iPhone 3G and its ability to "send photos, video, audio and more" with a mouse print-sized disclaimer indicating "MMS Support from AT&T coming in late summer."

44.   At certain times during the class period, both Apple and AT&T had in-store displays and/or videos that showed the iPhone sending photos via text messaging.  AT&T stores had seven foot-tall, white Apple kiosks that showed a continuously rolling video demonstrating all the features of the iPhone 3GS, including a specific section about MMS demonstrating

10

someone sending a video of kids playing on the beach and sending a picture of a sailboat via MMS.

45.    The false advertising regarding the MMS feature and messaging service plan was also reinforced by Apple's Guided Tour for the 3GS.  This Guided Tour had an entire section devoted to the iPhone's camera and claimed that the user could "MMS" pictures.

46.    Also in Apple's Guided Tour for the 3GS was a section devoted to MMS where the announcer claimed that the "messaging application on iPhone 3GS now supports MMS."

47.    On its website, Apple represented the following at certain times during the class period: Send MMS:

> *Take a photo or shoot some video, then send it via Messages.  You can also send audio recordings from Voice Memos, contact information from Contacts, and locations from Maps.*

48.    At certain times during the class period, a Pop-Up window on Apple's website read:

> *Sharing Photos and Videos: You can take a photo or make a video (iPhone 3GS only) from within Messages and include it in your conversation with another MMS-capable device.*

49.    On its website AT&T represented the following at certain times during the class period:

> *Messages:*
>
> *Use messages to send text, phone, audio, video, and more. Forward a whole message or just the important parts.*

50.    As a direct result of relying upon the false and deceptive representations and omission in Defendants' advertisements and promotions, millions of customers, including the

named Plaintiff herein, purchased the 3G and 3GS, reasonably expecting to have the ability to send and receive MMS messages on their iPhone 3Gs and 3GSs.

51.     Contrary to Defendants' advertising claims, AT&T's iPhone mobile phone messaging service did not support MMS during the class period.

52.     In furtherance of this false advertising, on July 21, 2009, a month after the launch of the 3GS, Apple held an Investors Conference Call.  Apple mentioned the availability of MMS (incorrectly stating it was "MMF").  During the Investors Conference Call Apple mentioned nothing about MMS not being available until late summer.

53.     Regardless of whether consumers purchased their iPhone 3Gs and/or 3GSs from Apple or AT&T, the purchase of an iPhone required a two-year contract for service through AT&T.  The iPhone could not be used on any other mobile phone service network in the United States.

54.     Regardless of the particular iPhone purchased, the same basic pricing plans existed for all iPhones.  For messaging, individual plans through AT&T were charged at $20 per month for Messaging Unlimited, $15 per month for Messaging 1500, and $5 per month for Messaging 200.  Family Plans were charged at $30 per month (per phone) for Messaging Unlimited.

55.     At various times during the class period, AT&T's invoices and account statement summaries specifically indicated that "Multimedia Messaging" or MMS was included in the messaging packages purchased by certain Class members.

56.     At least 12 other AT&T mobile phone providers provided MMS as part of the messaging bundles during the class period.  The AT&T mobile phone network had the capacity to support MMS services during the class period, and AT&T provided MMS to non-iPhone

customers.  But AT&T did not provide MMS to any iPhone customers during the class period, despite charging them the same rates for their messaging bundles.

57.   During the class period, AT&T charged iPhone customers the same price for messaging bundles per month, as represented in the iPhone customers' invoices that stated that the charge for messaging included MMS.  But AT&T failed to provide the MMS portion of the messaging service – even though it provided this service to all other AT&T mobile phone customers with MMS - capable telephones for the same price it was charging iPhone customers who were not provided the MMS service.  Specifically, for every other AT&T mobile phone, Messaging Unlimited, Messaging 1500, and Messaging 200 were the exact prices, respectively, as the Messaging Unlimited, Messaging 1500, and Messaging 200 charges for iPhone customers.

58.   During the class period, through advertising campaigns, Apple and AT&T each misrepresented and/or concealed, suppressed, or omitted material facts to and from customers about the fact that MMS was not an available feature on the iPhone 3G and 3GS.  Further, iPhone users had to pay for MMS if they wanted unlimited AT&T messaging plans.

## NAMED PLAINTIFF'S FACTUAL ALLEGATIONS

59.   On or about July 23, 2008, Plaintiff, LARRY ISHMAEL, went into an AT&T store located in Redmond, Washington, and was interested in purchasing cell phones with the MMS function

60.   Based upon the misleading information and advertising published within Washington State by Defendants, Plaintiff believed that the iPhone 3G would have MMS functionality.

61.   The store's representative misrepresented and/or concealed, suppressed, or omitted material facts as to the iPhone having MMS functionality.

13

62.   Plaintiff purchased a model of the iPhone 3G for personal, family, and household purposes.

63.   After purchasing the iPhone, Plaintiff learned that his iPhone lacked MMS capability.   Plaintiff also learned, based upon information promulgated by Defendants that a software update due out in the summer of 2009 would allegedly provide such functionality.

64.   When the 3.0 Software Upgrade became available, Plaintiff downloaded said software for his iPhone.  Despite this download, MMS still did not work on Plaintiff's phone.

65.   Only after a so-called "network upgrade" believed by Plaintiff to have occurred in late September 2009, did Plaintiff have any MMS functionality on his iPhone.

66.   Between the time Plaintiff purchased his iPhone and the time MMS functionality became available, Plaintiff paid AT&T monthly service charges for his iPhone.  He was unable to use MMS functions during that time.

67.   Plaintiff has been damaged in that he was unable to send or receive MMS messages for many months after purchasing the iPhone he was led to believe would have such functionality, and he paid for a monthly service plan during that time which he believed would entitle him to use a phone with MMS functionality on the AT&T network.  Due to Defendants' false and misleading statements, Plaintiff did not receive what he bargained for when he purchased his iPhone.

68.   LARRY ISHMAEL reasonably relied upon the representations by Apple and AT&T to form his belief that his iPhones had the ability to send picture messages by text.

## CLASS ACTION ALLEGATIONS

69.   Plaintiff brings this action as a class action on behalf of himself and all others similarly situated for the purpose of asserting claims alleged in this complaint on a common

basis.   Plaintiff's proposed class, as defined under Federal Rules of Civil Procedure 23(b)(3) includes thousands of iPhone 3G and 3GS purchasers who are similarly situated to Plaintiff and reside in Washington State.

70.   Plaintiff proposes to act as a representative of the following class composed of:

> All Washington residents who purchased an iPhone 3G or 3GS from AT&T Mobility LLC or Apple, Inc. from July 11, 2008 to September 25, 2009, primarily for personal, family, or household use.  Excluded from the Class are any judicial officers presiding over this action, and defendants, including their officers, directors, and employees.

> This Class includes the following Sub-Class:

> All Washington residents who purchased an iPhone and a text messaging plan from AT&T from July 11, 2008 to September 25, 2009 primarily for personal, family, or household use.  Excluded from the Sub-Class are any judicial officers presiding over this action, and defendants, including their officers, directors, and employees.

71.   The class is so numerous that joinder of all issues is impractical.  Similarly, the class is so numerous that joinder of all members is impractical.

72.   Plaintiff is unable to state the exact number of class members without discovery of the Defendants' records; however, upon information and belief, and based upon published news reports, over a million customers purchased the 3G iPhone the day it became available. Many of those customers are located in Washington State.  It is estimated that the class will be composed of at least 5,000 individuals.

73.   Plaintiff and Class members are claiming damages based upon the misconduct alleged herein and the lack of MMS functionality on the iPhones they purchased.  During the times relevant to this complaint, a 3G iPhone was selling from anywhere between $100.00 and $500.00.

15

74.     Additionally, no attorney would have the financial resources to litigate these cases against opposition from Defendants where the potential recovery for Plaintiff and each Class member is small.  Therefore, joinder of similarly situated individuals is appropriate.

## PREDOMINACE OF COMMON QUESTIONS OF LAW AND FACT

75.     The claims asserted by Plaintiff on behalf of himself and all similarly situated Class members present questions of fact or law common to the class, including, inter alia, where Defendants engaged in deceptive or unfair trade practices and/or published false or misleading advertisements within Washington State when making claims that MMS was available on the 3G and 3GS.

76.     Questions of law or fact common to the members of the class predominate over questions affecting individual members.  The common questions of law and fact include, but are not limited to, the following:

    a.  Questions of Fact:

        i.  Did the Defendants know that AT&T had not upgraded its network to support MMS and, if so, when did they gain this knowledge;

        ii.  Did the Defendants know that most customers viewed MMS as an important and integral function of any cell phone;

        iii.  Did the Defendants conceal from consumers that (1) AT&T had not upgraded its network to support MMS and had no plans to do so for many months; and (2) the 3.0 Software Upgrade would not resolve the problem and make MMS available;

iv.  Were Defendants aware of alternative methods of disclosure, which would
have more adequately warned customers of the unavailability of MMS and
the reasons for the non-availability of MMS;

v.  Did the Defendants market and advertise their 3G and 3GS phones as
supporting MMS with no mention, or little mention, of the fact that the
AT&T network was not equipped to support MMS;

vi.  Did the salesperson at Apple and AT&T have any scripts or training
materials, which would provide them with any knowledge or information
as to the fact that the AT&T network does not support MMS or any advice
as to when the AT&T network would be able to support MMS;

vii.  Whether according to market research of Apple and AT&T MMS
functionality is an important decision driver for customers when buying
iPhones;

viii.  When and if AT&T has finished its network upgrade so as to support
MMS;

ix.  Whether any officials from AT&T or Apple believe that the
advertisements to customers relating to MMS were misleading to
consumers;

x.  Whether AT&T or Apple have received complaints from consumers about
the lack of MMS functionality on the 3G and 3GS iPhones, and what
Defendants' response was, if anything;

xi.  What Defendants told their own managers and employees internally about
MMS functionality on the 3G and 3GS iPhones;

17

    xii.   Whether any internal committees or work groups were created by Defendants, or either of them, to address the lack of MMS functionality and if so, what was discussed during meetings of such committees or work groups; and

    xiii.   Why Apple and AT&T did not tell the truth to consumers about MMS functionality when consumers were purchasing 3G and 3GS iPhones at Defendants' stores?

b.   Questions of Law:

    i.   Whether Defendants engaged in unfair or deceptive trade practices as defined by Washington Statutes in connection with the sale and advertisement  of iPhones when they represented to Washington consumers that 3G and 3GS iPhones would have MMS functionality;

    ii.   Whether Defendants employed any deception, fraud, false pretense, false promise, or misrepresentation in connection with the sale or advertisement of merchandise when they represented to Washington consumers that 3G and 3GS iPhones would have MMS functionality;

    iii.   Whether Defendants employed any deception, fraud, false pretense, false promise, or misrepresentation, in connection with the sale or advertisement of merchandise when they represented to Washington consumers that the 3.0 Software Upgrade would allow their iPhones to have MMS functionality;

    iv.   Whether the Defendants concealed, suppressed, and/or omitted material facts when they failed to reveal to consumers that: (1) the network of

AT&T – the exclusive phone network for the iPhone – did not support MMS functionality; (2) AT&T would not have its network upgraded for many months; and (3) the 3.0 Software Upgrade would not, by itself, solve the lack of MMS functionality;

v. To what extent, and in what amounts, was Plaintiff and the class damaged by Defendants' unlawful actions; and

vi. Whether Defendants have any affirmative defenses and if so, whether those defenses are common to all Class members and are valid?

### Typicality

77.    The claims asserted by Plaintiff on behalf of himself are typical of the other Class members' claims in that the other Class members all received similar misrepresentations about MMS, also purchased the iPhone based upon these misrepresentations, and have all similarly suffered harm as a result of Defendants' violations of law, as alleged herein.

### Adequacy of Representation

78.    Plaintiff will fairly and adequately represent and protect the interests of the class because (1) Plaintiff has retained counsel experienced in the prosecution of such litigation and counsel will adequately represent the interest of the class, (2) Plaintiff and his counsel are aware of no conflicts of interest between Plaintiff and absent Class members or otherwise; and (3) Plaintiff is knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

### Superiority

79.    A class action provides a fair and efficient method for adjudicating this controversy and is superior to the other methods of adjudication in that (1) neither the size of the

class, nor any other factor, make it likely that difficulties will be encountered in the management of this class as a class action; (2) the prosecution of separate actions by individual class members, or the individual joinders of all Class members in this action is impracticable and would create a massive and unnecessary burden on the resources of Courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of each member of the class, (3) because of the disparity of resources available to Defendants versus those available to individual Class members, prosecution of separate actions would work a financial hardship on many Class members and (4) the conduct of this action as a class action conserves the resources of the parties and the Court system and protects the rights of each member of the class and meets all due process requirements as to fairness to all parties.  A class action is also superior to maintenance of these claims on a claim by claim basis when all actions arise out of the same circumstances and course of conduct.

## COUNT I:

## VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT

80.     Plaintiff, LARRY ISHMAEL, individually and on behalf of all others similarly situated, adopts and incorporates by reference all allegations contained in the previous paragraphs as though fully set forth herein.

81.     The transactions of Apple and AT&T at issue in this complaint constitute "trade or commerce" as defined by Revised Code of Washington ("RCW") 19.86.010.

82.     The Washington Consumer Protection Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  RCW 19.86.020.

83.     The Washington Consumer Protection Act was enacted to protect the both consumers and businesses against unfair methods of competition and unfair deceptive acts and practices in the conduct of trade or commerce.   Defendant's actions and/or omissions as described herein violate Washington's Consumer Protection Act in that Defendants misrepresented and omitted material information regarding the iPhone and its capabilities for MMS messaging.  Defendants also engaged in false advertising with respect to the iPhone and its capabilities for MMS in violation of this statute.

84.     As a result of the wrongful conduct described herein, Plaintiff and members of the class suffered damages.

85.     Plaintiff and members of the class are entitled to compensatory damages, equitable and declaratory relief, costs, and reasonable attorneys' fees.

### COUNT II:

### VIOLATION OF RCW 19.86.090

86.     Plaintiff, LARRY ISHMAEL, individually and on behalf of all others similarly situated, adopts and incorporates by reference all allegations contained in the previous paragraphs as though fully set forth herein.

87.     RCW 19.86.090 declares that "[a]ny person who is injured in his or her business or property by a violation of RCW 19.86.020, 19.86.030, 19.86.040, 19.86.050, or 19.86.060 . . . may bring a civil action in superior court to enjoin further violations, to recover the actual damages sustained by him or her, or both, together with the costs of the suit, including a reasonable attorney's fee. In addition, the court may, in its discretion, increase the award of damages up to an amount not to exceed three times the actual damages sustained[.]"

88.     Defendants misrepresented to Washington State's general public the capabilities and/or qualities of the iPhone 3G and 3GS with respect to MMS in violation of Washington's Consumer Protection Act, including RCW 19.86.090, with the intent and purpose of inducing members of the public to enter into an obligation to purchase products and services provided by Defendants.  At the time Defendants misrepresented the capabilities of the iPhone, Defendants knew such representations to be false and intended for members of the general public, including Plaintiff and Class members, to rely on such misrepresentations.

89.     Plaintiff and Class members relied upon the misrepresentations by Defendants regarding the iPhone 3G and 3GS and MMS functionality when purchasing 3G and 3GS iPhones and associated service contracts.

90.     As a proximate result of Defendants' misrepresentations of their goods and services in violation of RCW 19.86.090, Plaintiff and Class members sustained injury and damage.

91.     Plaintiff and Class members are entitled to compensatory damages, statutory treble damages, equitable and declaratory relief, costs, and reasonable attorneys' fees.

## COUNT III

### UNJUST ENRICHMENT

92.     Plaintiff, LARRY ISHMAEL, individually and on behalf of all others similarly situated, adopts and incorporates by reference all allegations contained in the previous paragraphs as though fully set forth herein.

93.     Defendants have received benefits from Plaintiff and the Class members in their purchase of the iPhone 3G and 3GS.

94.     By failing to disclose the lack of MMS functionality of the 3G and 3GS iPhones prior to late September 2009, Defendants have been unjustly enriched.

95.     As a direct and proximate result of the foregoing, Plaintiff and Class members have suffered damages.  Plaintiff and the Class members are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and attorneys' fees.

## COUNT IV

## BREACH OF EXPRESS AND IMPLIED WARRANTIES

96.     Plaintiff, LARRY ISHMAEL, individually and on behalf of all others similarly situated, adopts and incorporates by reference all allegations contained in the previous paragraphs as though fully set forth herein.

97.     Defendant AT&T required Plaintiff and Class members to enter into an agreement for wireless service in exchange for the "privilege" of purchasing an iPhone.  Specifically, Plaintiff and Class members were required to enter into an exclusive two-year wireless service agreement with AT&T.  The iPhone was forbidden from being used on any other wireless carrier's network.  Part of that two year service agreement for Class members included the purchase of messaging plans which were marketed and sold both as "unlimited messaging" and as messaging bundles.

98.     Plaintiff and Class members performed all conditions, covenants, and promises required by them on their part to be performed in accordance with the terms and conditions of the agreement.

99.     Defendant AT&T expressly and/or impliedly promised Plaintiff that the iPhone 3G and 3GS messaging plans included the ability to send pictures by text message.  This feature

23

is and has been at various times referred to as "picture messaging" "texting a picture" and by its more technical term – MMS.

100.     Defendant AT&T both explicitly and implicitly promised to provide the ability for iPhone users who purchased messaging plans and bundles (whether purchased as a "messaging unlimited" plan or purchased in finite numbers of messages) the ability to send picture messages.  AT&T charged the same price for each of its messaging plans and bundles to iPhone users as it charged to all other wireless service subscribers with cellular phones other than the iPhone.

101.     All other AT&T wireless customers were provided the picture messaging functionality for the same price charged to iPhone customers of AT&T.  iPhone users were denied this ability and functionality despite paying for it.  AT&T charged for this function knowing that during the class period AT&T could not and/or would not provide picture messaging with the iPhone 3G or 3GS and messaging plans.

102.     In return for this promise, Plaintiff and Class members paid AT&T for messaging plans reasonably expecting these plans to include the ability to send picture messages.

103.     AT&T breached the agreement by failing to provide messaging service plans that included the ability to send picture messages during the Class period.

104.     As a result of Defendants' breach of the agreements with Plaintiff and Class members, Plaintiff and the Class members suffered damages to be determined according to proof at the time of trial.

## COUNT V

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

105.    Plaintiff, LARRY ISHMAEL, individually and on behalf of all others similarly situated, adopts and incorporates by reference all allegations contained in the previous paragraphs as though fully set forth herein.

106.    The contract between Plaintiff and Defendants included an implied covenant of good faith and fair dealing.

107.    Defendants each breached this implied covenant in the contract when, in bad faith, they promised to provide an iPhone and messaging service plan that included MMS, charged for that functionality, knowing that during the class period they could not and/or would not provide MMS with the iPhone 3G, 3GS, and messaging plans.

108.    As a result of the Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class members suffered damages to be determined according to proof at the time of trial.

## COUNT VI

## NEGLIGENT MISREPRESENTATION

109.    Plaintiff, LARRY ISHMAEL, individually and on behalf of all others similarly situated, adopts and incorporates by reference all allegations contained in the previous paragraphs as though fully set forth herein.

110.    Defendants misrepresented, concealed, suppressed, or omitted the following material facts in connection with the sale and advertisement of iPhone 3G, iPhone 3GS and messaging plans to Plaintiff and Class members:

25

    a.   AT&T had not upgraded its network to support MMS, and, therefore, MMS would be unavailable on iPhones until the network was upgraded;

    b.   AT&T would not have its network upgraded for many months;

    c.   The 3.0 Software Upgrade would not, by itself, solve the problem and make MMS available on the iPhone.

111.   Defendants failed to exercise ordinary care in their advertising, marketing, and sale of the iPhone 3G, iPhone 3GS, and messaging plans to Plaintiff, Class members, and/or the general public.

112.   Defendants breached their duty in representing the functionality and effectiveness of the MMS feature for the iPhone 3G, iPhone 3GS and their associated messaging plans to Plaintiff, Class members, and/or the general public.

113.   As a direct result of the deception, misrepresentation, unfair practices, concealment, suppression, and omission by each Defendant, Plaintiff has suffered an ascertainable loss of money, including, but not limited to the difference in value between the iPhone and messaging plans as represented and the iPhone and messaging plans that Defendants actually provided to Plaintiff and Class members.

114.   Defendants' actions were negligent, if not intentional, without a justification or excuse.

115.   As a direct and proximate result of the foregoing acts and omissions, Plaintiff and Class members have suffered damages. Plaintiff and Class members are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

116.    WHEREFORE, Plaintiff, LARRY ISHMAEL, individually and on behalf of the proposed class, prays for the Court to:

    a.   Enter an order certifying a class pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) consisting of the class defined herein and directing that appropriate notice to Class members be delivered;

    b.   Designate Plaintiff as representatives of the proposed class and designate his counsel as class counsel;

    c.   Enter judgment in favor of Plaintiff and the Class and against Defendants Apple, Inc. and AT&T Mobility LLC;

    d.   Award Plaintiff and the Class members' restitution, disgorgement, actual, statutory and punitive damages, and attorneys' fees and costs, including pre-judgment and post-judgment interest thereon;

    e.   Enter a temporary, preliminary, and permanent order for injunctive relief enjoining Defendants from continuing to engage in the business practices complained of herein; and

    f.   Provide such further relief as the Court deems just and proper.

**

*

## JURY DEMAND

117.    Plaintiff, LARRY ISHMAEL, individually and on behalf of the Plaintiff Class

Members, hereby demand a trial by jury as to all issues so triable.


DATED: March 15, 2011                    Respectfully Submitted,

                                         /s/ CRAIG K. VERNON

                                         CRAIG K. VERNON
                                         James, Vernon & Weeks, P.A.
                                         1626 Lincoln Way
                                         Coeur d'Alene, ID 83814
                                         Telephone: (208) 667-0685
                                         Facsimile: (208) 664-1684
                                         Email: cvernon@jvwlaw.net